**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

_____

ALLIANCE FOR THE WILD ROCKIES,
NATIVE ECOSYSTEMS COUNCIL, and
THE ECOLOGY CENTER, INC.,

CAUSE NO. CV 04-78-M-DWM

        Plaintiffs,

    vs.

FINDINGS & RECOMMENDATION
OF UNITED STATES
MAGISTRATE JUDGE

ABIGAIL KIMBELL, Regional Forester
of Region One of the U.S. Forest
Service; TOM CLIFFORD, in his
official capacity as Forest
Supervisor for the Helena National
Forest; and UNITED STATES FOREST
SERVICE, an agency of the U.S.
Department of Agriculture,

        Defendants.

_____

This matter comes before the Court on the parties' cross-motions for summary judgment.  Following a hearing, and the Court's review of the briefs and other materials of record,

<u>**RECOMMENDATION**</u>

IT IS RECOMMENDED that the Defendants' Motion for Summary Judgment be **GRANTED** and the Plaintiffs' Motion for Summary Judgment be **DENIED**.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a

copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel within ten (10) days after receipt hereof, or objection is waived.

DONE and DATED this 7th day of September, 2006

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge

**DISCUSSION**

## I.  Introduction

Plaintiffs Alliance for the Wild Rockies, Native Ecosystems Council, and the Ecology Center ("Plaintiffs") bring this action seeking judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, of a decision by the Defendants, Abigail Kimbell, Tom Clifford, and the United States Forest Service ("Forest Service") approving the Clancy-Unionville Vegetation Manipulation and Travel Management Project ("Project") in the Helena National Forest ("HNF").[1]  Plaintiffs assert several claims under the National Forest Management Act ("NFMA"),

---

[1] In their Complaint, Plaintiffs also challenge the Forest Service's continuing implementation of the 1986 Helena National Forest Plan ("Forest Plan").  As discussed below, however, Plaintiffs stated at the July 18, 2006, hearing that they have abandoned any challenge to the Forest Plan itself.

16 U.S.C. §§ *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

Plaintiffs allege generally in their first claim for relief that the Forest Service violated the NFMA by failing "to ensure region-wide consistency in standards, technologies, and methods used in habitat planning and evaluation and monitoring of wildlife" and "to coordinate conservation strategies and habitat planning for those species distributed over more than one forest." Compl. p. 35  (Apr. 29, 2004).  The second claim alleges that the Forest Service "failed to obtain and keep current inventory data appropriate for planning and managing HNF resources, including quantitative data making possible the evaluation of diversity in terms of prior and present condition." Complaint, p 38.

Plaintiffs' third claim for relief alleges that the Forest Service failed to comply with the requirements of NFMA because it did not insure the viability of management indicator and sensitive species before approving the Project.  Complaint, ¶¶ 170-181.  The fourth claim for relief charges that the Forest Service violated NFMA by continuing to implement an outdated and ineffective Forest Plan.  Complaint, ¶ ¶ 183-85.  The fifth claim for relief alleges that the Forest Service violated NFMA by failing to demonstrate that old growth habitat treated with timber harvest would still satisfy the Forest Plan definitions

for old growth, thereby meeting the needs of old growth dependent species. Complaint, ¶¶ 187-190. Plaintiffs' sixth claim for relief contends that the Forest Service violated NFMA by failing to demonstrate compliance with conservation strategies for the Canada Lynx. Complaint, ¶¶ 192-195. Finally, Plaintiffs allege in their seventh claim for relief that the Forest Service violate NEPA by failing to take a hard look at the cumulative effects of the Project, and by improperly tiering the Project to decisions in a non-NEPA document.

## II. Factual Background

In April 1986, the Forest Service adopted the Helena National Forest Plan, which "serves as the single land management plan for the Helena National Forest." AR 1 W1, at IV-2. As required by the applicable regulations, the Forest Service conducted a Five Year Review of the Forest Plan in 1994 ("1994 FYR"). The 1994 FYR was prepared by an Inter-Disciplinary Team ("IDT") of Forest Service experts, who recommended several amendments to the Forest Plan. The Forest Service still manages the HNF under the 1986 Plan.

For the past seventy-five years, the Forest Service has employed a policy of aggressive fire suppression on Helena National Forest lands. AR 1, W8 at 2-3. According to the Forest Service, this longstanding policy has increased the threat of catastrophic wildfires, because "increasingly dense understory

vegetation" places some stands of conifer trees "at increased risk of fires moving up into the crowns of the trees and sweeping uncontrollably through them."  AR 1 W8, at 4.   To address this increased risk of fire, as well as a number of other concerns, the Forest Service developed the Clancy-Unionville Vegetation and Travel Management Project.

The Forest Service has identified the many purposes of the Project as follows: (1) to provide for healthy native forest/grassland plant communities; (2) to reduce the threat of large scale, catastrophic wildfire; (3) to insure a variety of animal habitats to meet the needs of the area's animal species; (4) to manage and maintain a system of road and trails that serve the needs of a wide variety of forest users; (5) to produce an array of wood products while still maintaining a sustainable forest, and; (6) to maintain/improve water quality and watershed conditions for the short and long term. AR 1, W9 at 22-23.  The Project area is made up of 39,530 acres of federal, state, and private lands near the City of Helena and the rural communities of Unionville, Clancy, and Jefferson City.  AR 1, W9 at 103; AR 1, W8 at 3.  The Project calls for 1,450 acres of timber harvest, 2,500 acres of prescribed fire for the stated purpose of reducing fuels and improving grasslands, 850 acres of chainsaw thinning, and the closure of 28 miles of existing road.  AR 1, W8, at 2.

Pursuant to NEPA, the Forest Service prepared an

environmental impact statement (EIS) for the Project, and released it for public review in 1998.  The Forest Service completed a Final EIS (FEIS) in February 2000, and issued a Record of Decision ("ROD") several months later.  AR 1, W6. Several organizations administratively appealed the October 2000 ROD, and the Regional Forester subsequently remanded the decision to the HNF for further analysis.  AR 1, X1-8; X36-38.  The HNF released a draft supplemental EIS in December 2001, and the Final Supplemental EIS (FSEIS) and ROD in February 2003.  AR 1, W8, W9. Plaintiffs appealed the ROD to the Regional Forester, who affirmed the decision in its entirety in April 2003.  AR 1, BB24, BB25.  Plaintiffs in turn commenced this action in April 2004.

### III.  Analysis

**A.   Legal Standards Applicable to All Claims**

**1.   Standard of Review under the APA**

Under the APA, the court can set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law."  *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).  Pursuant to this standard, the court can set aside agency action "if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency

expertise, or if the agency's decision is contrary to the governing law." *Lands Council*, 395 F.3d at 1026 (internal citations omitted) (*citing* 5 U.S.C. § 706(2)).  The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment...[The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made. [The] review must not rubber-stamp...administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps. Of Engineers*, 361 F.3d 1108, 1119 (9th Cir. 2004)(internal citations and quotations omitted).

> **2.  Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.; *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment is particularly applicable to cases involving judicial review of final agency action.  *Occidental Engineering Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).  Summary judgment is appropriate in this case because the issues presented address the legality of the Forest Service's actions based on the administrative record, and do not require resolution of factual

disputes.

**B.   National Forest Management Act**

    **1.   Legal Standard**

NFMA sets forth the statutory framework for managing our nation's forests, and establishes a two-step "tiering" process for forest planning. *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1376 (9th Cir. 1998); 16 U.S.C. § 1604(a).  At the first step, NFMA directs the Forest Service to develop a Land and resource Management Plan, also known as a forest plan. *Lands Council*, 395 F.3d at 1032-33.  The development of a forest plan takes place within a public review process conducted in accordance with NEPA.  16 U.S.C. § 1604(g)(1); 36 C.F.R. § 219.10(b).  Once a forest plan has been approved, the second step for forest planning under NFMA involves implementation of the forest plan through site-specific projects. *Neighbors of Cuddy Mountain*, 137 F.3d at 1376.  All site-specific projects, such as the Project at issue here, "must be consistent with the stage-one, forest-wide plan." *Inland Empire v. U.S.F.S.*, 88 F.3d 754, 757 (9th Cir. 1996); 16 U.S.C. § 1604(I).

NFMA also imposes substantive obligations on the Forest Service, including the requirement "to provide for diversity of plant and animal communities."  16 U.S.C. § 1604(g)(3)(B); *Neighbors of Cuddy Mountain*, 137 F.3d at 1376.

    **2.  Plaintiffs' NFMA Claims**

Plaintiffs' Complaint asserts several claims under NFMA, variously challenging either the Forest Plan and planning process or the subsequent Project.  With regard to the Forest Plan and planning process, Plaintiffs first allege the Forest Service violated NFMA by failing to release the results of the 1994 FYR, thereby frustrating the public's participation in the forest planning process.  Plaintiffs next claim that the Forest Service violated NFMA because it did not revise or amend the Forest Plan to reflect the concerns expressed in the 1994 FYR.  Plaintiffs also challenge the Project itself, claiming first that the Project does not comply with the Forest Plan's old growth standards.  Finally, Plaintiffs contend that the Project violates NFMA's requirement to assure the viability of populations of management indicator and sensitive species.

### a.   Applicable regulations

As a preliminary matter, the parties dispute which version of the federal regulations codified at 36 C.F.R. Part 219 is applicable to Plaintiffs' various claims in this case.  In November 2000, the Forest Service amended the 1982 regulations previously set forth in 36 C.F.R. Part 219 (1982).  65 Fed. Reg. 67568 (Nov. 9, 2000).  The 2000 regulations contained a transitional provision governing plan amendments and revisions, as well as site-specific decisions.  36 C.F.R. 219.35 (2001). Section 219.35(d) delayed application of most of the 2000

regulations to site-specific decisions until the conclusion of the transition period.  36 C.F.R. § 219.35(b)(d)(2001).  That transition period began on November 9, 2000, and ultimately continued until January 5, 2005, at which time a new set of regulations took effect.  *See* 67 Fed. Reg. 35,431 (May 20, 2002); 68 Fed. Reg. 53,294 (Sept. 10, 2003); 70 Fed. Reg. 1022, 1023 (Jan. 5, 2005).

The 2005 regulations have brought some substantive changes, including relieving the Forest Service of its duty to maintain habitat viability as previously set forth in 36 C.F.R. § 219.19. *See* 36 C.F.R. Part 219 (2005).  The Forest Service originally argued in its summary judgment briefing that Plaintiffs' claims in this case are moot because the 1982 regulations upon which they largely rely have been repealed and replaced by the 2005 regulations.  Defs.' Br. in Support of Combined Cross Motion, 4 (June 21, 2005).  It was the Forest Service's position in briefing and at oral argument that the 2005 regulations should apply retroactively, rendering moot Plaintiffs' challenge to the 1986 Forest Plan and 2003 Project.

The Forest Service has since conceded in supplemental briefing that the 2005 regulations do not apply retroactively. Defs.' Supplemental Br., 5-9 (Aug. 4, 2006).  It is clear that this Court must instead apply the regulations in effect at the time of the Forest Service's decision approving the Project.  The

question, then, is what regulations were in effect in February 2003, when the Forest Service issued its ROD approving the Project.  The Forest Service now argues that the transition provisions of the 2000 rule should apply.  Defs.' Supplemental Br., 5-9 (Aug. 4, 2006).  The Forest Service's argument is consistent with the Tenth Circuit's recent decision in *Ecology Center, Inc. v. U.S. Forest Service*, 451 F.3d 1183 (10th Cir. 2006), cited by the Plaintiffs at oral argument.

In that case, the Tenth Circuit held that the 2000 transition rule applied to a site-specific project approved during the transition period.  *Ecology Center,* 451 F.3d at 1191-92.  In doing so, the court cited an interpretive rule promulgated by the Department of Agriculture in 2004, which "explains that, during the transition period from November 2000 until promulgation of a final rule (in January 2005), only the transition provision of the 2000 regulations applied."  *Ecology Center*, 451 F.3d at 1191 (citing 69 Fed. Reg. 58,055, 58,057 (Sept. 29, 2004)).  The court thus concluded that "neither the remainder of the 2000 planning regulations nor any of the 1982 regulations were binding on site-specific decisions during this period."  *Ecology Center*, 451 F.3d at 1191.  The transition rule the court found was applicable required that, "[d]uring the transition period, the responsible official must consider the best available science in implementing...the current plan."  36

-11-

C.F.R. 219.35(a).  The *Ecology Center* court thus held "that the Forest Service's exclusive application of the 1982 Rules and the failure to consider or mention the 'best available science' standard amounted to conduct that [was] arbitrary and capricious."  *Ecology Center*, 451 F.3d at 1192.  Because the Forest Service's March 2003 ROD failed to "consider or mention the Project's compliance under the 2000 transition rule," the court remanded the case to the district court with instructions to vacate the Forest Service's approval of the project.  *Ecology Center*, 451 F.3d at 1195.

Although the Ninth Circuit has not addressed this issue directly, it has nevertheless applied the standards set forth in the 1982 regulations to Forest Service decisions made after November 2000.  In *Native Ecosystems*, for example, the Ninth Circuit applied the regulations set forth in the July 1, 2000, Code of Federal Regulations to a Project approved sometime after December 2000.[2]  *Native Ecosystems*, 428 F.3d at 1237 n. 5.  The court recognized that "[n]ew regulations amending the forest planning rule were adopted on November 9, 2000," but concluded that because "application of these regulations was delayed," the regulations relevant to the project at issue could be found in the July 1, 2000, Code of Federal Regulations.  *Native*

---

[2] It is unclear from the discussion in that case exactly when the Forest Service approved the Jimtown Project.

-12-

*Ecosystems*, 428 F.3d at 1237 n. 5.  *See also, Environmental Protection Information Center v. USFS*, 451 F.3d 1005, 1017 (9th Cir. 2006) (applying standards in 1982 regulations as set forth in 36 C.F.R. § 219.19 (2000) to a project approved after October 2002); *Earth Island Institute v. U.S.F.S.*, 442 F.3d 1147, 1173 (9th Cir. 2006).

Nevertheless, assuming that the 2000 transition regulation applies, the Forest Service must still comply with the requirements of the Forest Plan.  In *League of Wilderness Defenders-Blue Mountain Biodiversity Project v. Bosworth*, 383 F.Supp.2d 1285, 1303 (2005), the District Court for the District of Oregon concluded that the 2000 transition provision applied to a project approved in 2003.  As the court recognized, however, the Forest Service was still obligated to fulfill its obligations under the Forest Plan.  Specifically, the Oregon court framed the question before it as whether "the Forest Service followed the best available science in a manner consistent with the" Forest Plan.  *League of Wilderness Defenders*, 383 F.Supp.2d at 1303. The court granted the Forest Service's motion for summary judgment, noting that it "had received no evidence showing that the EIS [at issue did] not comply with [Forest Plan] requirements relating to management indicator species."  *League of Wilderness Defenders*, 383 F.Supp.2d at 1303.

As in that case, the issue here is whether the Forest

-13-

Service followed the best available science in a manner consistent with its obligations under the Forest Plan.  As discussed at length below, the Court concludes that the Forest Service's decision approving the Project complies with the Forest Plan's requirements, and relied on the best available science consistent with its obligations under the Forest Plan.

### b.   1994 Helena National Forest Plan Five Year Review

In June 1994, the Forest Service issued a Helena National Forest Plan Five Year Review prepared by an interdisciplinary team of experts pursuant to NFMA's implementing regulations.   AR 2, DD1.   The 1994 FYR at issue here proposed ten amendments to the Forest Plan.  AR 2, DD1 at 2.  Plaintiffs advance two claims related to the 1994 FYR in their Complaint.  First, they complain that the Forest Service failed to involve the public in the FYR process or release the document to the public.  Second, they maintain the Forest Service violated NFMA by failing to amend the Forest Plan as recommended by the IDT.

At oral argument, however, the Plaintiffs abandoned these claims.  When asked by the Court, Plaintiffs explained that they are not challenging the Forest Plan itself, and that their only claim in this case is that the Project does not comply with the 1986 Forest Plan.

### c.   "Treatment" of Old Growth Habitat

In count five of their Complaint, Plaintiffs allege what the

Ninth Circuit considered a winning argument in *Ecology Center v. Austin*, 430 F.3d 1057 (9th Cir. 2005).   Count five asserts that the Forest Service "has violated NFMA by failing to demonstrate that treating old growth habitat does not harm old growth species."  Complaint, p. 44.   According to Plaintiffs, "[t]he Project would 'treat' existing old growth and replacement old growth pursuant to an untested theory of 'enhancing' or 'stabilizing' old growth habitat through logging."  Complaint, ¶ 187.   Plaintiffs charge that "[d]espite being presented with scientific studies and concerns from qualified experts that call into question the assumptions underlying the Project's goal of 'enhancing' old growth habitat through timber harvest, the [Forest Service] failed to address these concerns or disclose and analyze the inherent risks and uncertainties associated with such an untested theory in the body of the EIS or SEIS, as required by NEPA."  Complaint, ¶ 188.  "In spite of the concerns expressed over treating old growth habitat with timber harvest," Plaintiffs assert, "the [Forest Service] failed to demonstrate that such habitat would still meet the Forest Plan definitions for old growth habitat set forth in Forest Plan Appendix Z after logging was complete, thus providing no assurance of any kind that the treated habitat would still meet the needs of old growth dependent species."  Complaint, ¶ 189.

In *Ecology Center v. Austin*, the plaintiff sought judicial

review of a decision by the Forest Service approving a project "designed in the aftermath of the 2000 wildfires on the Lolo National Forest." *Ecology Center*, 430 F.3d at 1060.  The project approved in that case involved "commercial thinning of small diameter timber and prescribed burning in old-growth forest stands, as well as salvage logging of burned and insect killed timber in various areas of the forest." *Ecology Center*, 430 F.3d at 1061.  The plaintiff sought judicial review, objecting "to the Forest Service's decision to permit commercial logging in old-growth forest stands, raising concerns about the impact of such logging on the viability of species that are dependent upon old-growth habitat, such as the pileated woodpecker and the northern goshawk." *Ecology Center*, 430 F.3d at 1061.  In its defense, the Forest Service cited several studies indicating such treatment was "necessary to correct uncharacteristic forest development resulting from years of fire suppression," and "point[ed] out that the treatment [was] designed to leave most of the desirable old-growth trees in place and to improve their health." *Ecology Center*, 430 F.3d at 1063.  The plaintiff in turn "highlight[ed] the scientific uncertainty and debate" surrounding such old growth treatment, and alleged it would adversely affect old growth dependent species. *Ecology Center*, 430 F.3d at 1063.

The Ninth Circuit sided with the plaintiff, concluding based on the record before it that "the Forest Service's conclusion

that treating old-growth forest is beneficial to dependent species is predicated on an unverified hypothesis." *Ecology Center*, 430 F.3d at 1064.  The court faulted the Forest Service for failing to "test its theory with any 'on the ground' analysis, despite the fact that it [had] already treated old-growth forest elsewhere" and could have done so.  *Ecology Center*, 430 F.3d at 1064.  In light of the Forest Service's failure to study the effects of commercial thinning and prescribed burning in old growth forests, the Ninth Circuit concluded that its approval of such a project was arbitrary and capricious under NFMA.  *Ecology Center*, 430 F.3d at 1065. [3]

Plaintiffs' challenge in this case, as set forth in their fifth claim for relief, is virtually identical the one it brought in *Ecology Center*.  But Plaintiffs did not address this claim in their summary judgment briefing, instead focusing on the Forest Service's use of the habitat-as-proxy approach to assuring the viability of old growth species.  Not surprisingly, Plaintiffs now seek to elaborate on this claim in light of the *Ecology Center* decision, which post-dated the close of summary judgment

---

[3] The Ninth Circuit similarly concluded that the Forest Service's "analysis of the impact of treating old-growth [was] inadequate under NEPA, because the EIS failed to adequately explain or address the "public's concerns regarding the impact of treatment on dependent species." *Ecology Center*, 430 F.3d at 1065.

briefing in this case by four months.[4]

Plaintiffs' efforts notwithstanding, the record demonstrates that this case is distinguishable from the *Ecology Center* case in several significant respects. First, the Project at issue here is a fuels reduction project, not a timber salvage project. As such, the Project in this case calls for "treating" only 17 acres of existing old-growth, and 23 acres of replacement old growth.[5] AR 1, W9 at 325-326. According to the Forest Service, this represents only "about 1% of the old-growth resource inventories so far in the project area." AR 1, W9 at 325-26. The record indicates that the Project will not result in the loss of any old growth. AR1 W9, at 177. The fact that the Project at issue here will not result in the loss of any old growth distinguishes this case from *Ecology Center*.

> **d.  Is the Project consistent with the Forest Plan's old growth preservation standards?**

--------

[4] On July 14, 2006, Plaintiffs' filed an Amended Notice of Supplemental Authority, citing several cases including the *Ecology Center* case. The Forest Service has since moved to partially strike the Amended Notice on the basis that it raises new argument as prohibited by Local Rule 7.5. That rule states, in pertinent part, that a notice of supplemental authority "may not exceed two (2) pages and shall not present a new argument." Plaintiffs' Amended Notice is three pages long, and contains argument that elaborates significantly on the bare allegations in the Complaint. The Court will nevertheless address the effect of the *Ecology Center* case and deny the Forest Service's motion to partially strike the Amended Notice.

[5] That treatment "would be accomplished with underburning and selective thinning." AR 1, W9, at 326.

Plaintiffs argue that the Project does not comply with the old growth standards set forth in the 1986 Forest Plan.  As the Ninth Circuit has recognized, "[i]t is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S.F.S.*, 418 F.3d 953, 961 (9th Cir. 2005).  NFMA specifically provides that "[r]esource plans, permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."  16 U.S.C. § 1604(I).  Pursuant to this standard, "the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest."  *Neighbors of Cuddy Mountain,* 303 F.3d at 1063.

The Forest Plan at issue here requires that each third order drainage retain a minimum of 5% old growth habitat, in order to insure the viability of old growth species. Specifically the Forest Plan states that "[f]ive percent of each third order drainage should be managed for old growth."  AR, W1 at II/20.  According to Plaintiffs, the Project does not comply with this standard because the Project area includes four third order watersheds, three of which contain less than 5% old growth habitat.  Pls.' Br. in Support, 11.  Plaintiffs contend that the Last Chance Gulch and Comet Creek watersheds "contain no old growth habitat whatsoever," and Clancy Gulch contains only 2% old

growth.  Pls.' Br. in Support, 11 (citing 1AR W9, at 325).
Because the project area is out of compliance with the Forest
Plan's old growth standards, Plaintiffs argue that the decision
to approve the Project, which they maintain would further disturb
the old growth habitat, violates NFMA.

The Forest Service argues in response that Plaintiffs have
misinterpreted the record, and maintains that the project area in
fact contains only one third order drainage.  Both parties point
to the February 2003, FSEIS to support their respective
positions.  AR1 W9.

The FSEIS indeed addresses old growth, stating specifically
that "[t]here is only *one* third order drainage on the Forest in
the Clancy Unionville area, which is Buffalo [C]reek."  AR1 W9,
at 308.  For purposes of "analyz[ing] the old growth for this
project," however, the FSEIS explains that "1st and 2nd order
drainages were combined to assess the resource."  AR1 W9, at 308.
A chart on the next page depicts old growth by major watershed.
AR 1 W9, at 309.  A column titled "third order watershed" lists
the four drainages cited by Plaintiffs, and the chart then
identifies the percent of old growth within each of those
watersheds.  AR 1 W9, at 309.

While Plaintiffs' position is understandable in light of the
chart's reference to "third order watershed[s]," it is clear from
the preceding sentence that there is in fact only one third order

drainage in the area, and the report combined "1st and 2nd order drainages" for purposes of assessing old growth.  The one third order drainage in the project area contains 10% old growth, which comports with the Forest Plan's standards.  AR1 W9, at 309.

According to the FSEIS, the Project ultimately approved by the Forest Service would result in no lost old-growth.  AR1 W9, at 177.  The FSEIS states that "[f]ield inventories have identified 1,349 acres of established old-growth in the Clancy-Unionville project area," and "[a]nother 1,820 acres have been designated as replacement old-growth."  AR1  W9, at 177.  Under alternative F, which was adopted in the February 2003 ROD, "no old-growth would be lost" because all 1,349 acres of old-growth would be retained.  AR1 W9, at 177.

Because the Project would result in no loss to the old growth in the area's one third order drainage, which contains 10% old-growth, the Project complies with the Forest Plan's old growth standards.  *See Lands Council*, 395 F.3d at 1035-36 (holding that  "[b]ecause no old growth forest [was] to be harvested under the Project...it [could] not be said that the Project itself violate[d] the [Forest] Plan's requirement to maintain ten percent" old growth).

> **e.   Is the Project consistent with NFMA's substantive mandate to ensure the viability of old growth species and their habitat?**

Plaintiffs argue the Forest Service did not fulfill its duty

under NFMA to "provide for diversity of plant and animal
communities" as required by NFMA.  16 U.S.C. § 1604(g)(3)(B).
Under NFMA's implementing regulations,

> Fish and wildlife habitat shall be managed to maintain
> viable populations of existing native and desired non-native
> vertebrate species in the planning area. ... In order to
> insure that viable populations will be maintained, habitat
> must be provided to support, at least, a minimum number of
> reproductive individuals and that habitat must be well-
> distributed so that those individuals can interact with
> others in the planning area.

36 C.F.R. § 219.19 (2000).  This "duty to ensure viable
populations 'applies with special force' to sensitive species."
*Native Ecosystems Council v. U.S.F.S.*, 428 F.3d 1233, 1250 (9th
Cir. 2005) (*quoting Inland Empire Pub. Lands Council v. U.S.F.S.*,
88 F.3d 754, 759 (9th Cir. 1996)).

Plaintiffs argue the Forest Service has not fulfilled its
obligation to ensure species viability because it used "a
qualitative rating system...as a means of getting at population
viability," rather than quantitative data.  Plaintiffs' Br. in
Support, 12.  According to Plaintiffs, the Forest Service must
use population counts to satisfy its obligations under 36 C.F.R.
§ 219.19 (2000), and cannot rely on habitat data.[6]

_____

[6] Plaintiffs have consistently maintained that the 1982
regulations apply in this case.  As discussed above, however, it
is not clear whether the Ninth Circuit would continue to apply
the standards set forth in those regulations in light of the
Tenth Circuit's recent *Ecology Center* decision.  Regardless, as
discussed below, the Forest Service has satisfied its obligations
under both the 1982 regulations and the 2000 transition
provision.

But the Ninth Circuit has repeatedly endorsed the Forest Service's use of habitat data, rather than population counts, as a means of ensuring the viability of management indicator and sensitive species.  *See e.g.*, *Environmental Protection Information Center v. U.S.F.S.*, 451 F.3d 1005, 1017 (9th Cir. 2006) ("*EPIC*"); *Inland Empire*, 88 F.3d at 761; *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1154 (9th Cir. 1998); *Native Ecosystems*, 428 F.3d at 1251.  "The analysis of quality and quantity of habitat, rather than actual MIS populations, is commonly referred to as the 'proxy on proxy' methodology."  *EPIC,* 451 F.3d at 1017.  The proxy-on-proxy approach "essentially assumes that 'maintaining the acreage of habitat necessary for survival would in fact assure a species' survival."  *EPIC*, 451 F.3d at 1017 (*quoting Inland Empire Public Lands Council v. U.S.F.S.*, 88 F.3d 754, 761 (9th Cir. 1996)).  The Ninth Circuit has approved the use of "habitat as a proxy for population," as long as the underlying methodology is sound.  *EPIC*, 2006 WL 1716746, at 13.  If, however, "the habitat trend data is flawed, the proxy on proxy result...will be equally flawed," resulting in a violation of NFMA's population monitoring requirements.  *Lands Council*, 395 F.3d at 1036.  In *Earth Island Institute*, the Ninth Circuit similarly rejected use of habitat monitoring where the Forest Plan itself expressly required "population monitoring" in the form of "distribution data."  *Earth Island Institute*, 442

-23-

F.3d at 1175.

To determine whether the Forest Service satisfied its
population monitoring obligations under NFMA, this Court must
thus examine the methodology used in the Project analysis, as
well as the terms of the Forest Plan itself.

Plaintiffs indeed argue that the Forest Plan "unambiguously
requires quantitative, not qualitative, data to demonstrate
compliance with [NFMA's] species viability requirements."  Pls.'
Br. in Support, 14.  For support, they quote Forest Plan language
stating that "[p]opulations of wildlife indicator species will be
monitored to measure the effect of management activities on
representative wildlife habitats."  AR 1 W1, II-17.  That general
statement is then qualified by the "specific monitoring
requirements" found in Chapter IV of the Plan.  AR 1 W1, at II-
17.  Those specific monitoring requirements are habitat-based and
state that the data sources for monitoring  "old growth habitat
(indicator species pileated and hairy woodpeckers and the
goshawk)" include "project EAs [and] habitat sampling by
transects of species density."  AR 1 W1 at IV/8.  The Forest Plan
requirements also establish a monitoring frequency for old growth
habitat contemplating that 20% of old growth habitat units would
be surveyed annually.  AR1 W1 at IV/8.  The requirements further
state that the data sources for monitoring  "mature conifer
suitability (indicator species pine marten track counts) include

"project EAs [and] habitat sampling by transects of marten use."
AR1 W1 at  IV/8.

To determine whether the Forest Service adequately analyzed
the Project's potential effect on old growth associated species,
this Court must examine the methodology underlying its monitoring
efforts, and whether those monitoring efforts satisfied the
Forest Plan's standards.

### i.    Goshawk

Plaintiffs argue the Forest Service's decision approving the
Project will jeopardize the viability of the goshawk.
Specifically, they claim the Forest Service has produced no
"population data or forest-wide habitat proxy data" establishing
that the goshawk is viable in the Helena National Forest.  Pls.'
Br. in Support, 16.

The Forest Plan standard for the goshawk requires that the
Forest Service monitor old growth habitat.  AR 1 W1, at IV/8.
As noted above, the Forest Plan contemplates that "20% of old
growth habitat units" would be surveyed annually.  AR1 W1 at
IV/8.  The record documents the Forest Service's extensive
monitoring of old growth throughout the Helena National Forest.
For example, it contains several forest-wide old growth surveys,
including the 2002-2003 monitoring report in which the Forest
Service explained the results of recent Forest Inventory and
Analysis data.  AR 2, DD214, at 22-28.  In addition, data

compiled for a forest-wide survey of old growth established that
there is a "substantial amount," at least 8.6%, of well-
distributed old growth forest-wide.  AR 2, DD214, at 23-24; AR 2,
CC18, at 25-26.  Plaintiffs do not dispute that the Forest
Service has completed "field verified" old growth inventories of
the Project area.  AR 2, DD214, at 23-24; AR 2, CC18, at 25-16.
Moreover, as noted above, the Project would result in no lost
old-growth.  AR1 W9, at 177.  The record further indicates that
the timber harvest under the Project will not displace any
resident goshawk.  AR 1, W9 at 178.  The Forest Service has
mapped forest-wide habitat for goshawks.  AR1 S17, at 53; AR 1
T49.

The Forest Service points to evidence of record, indicating
that it did indeed obtain habitat and species population data for
the goshawk.  For example, according to a February 2003
biological evaluation assessing the potential effects of the
Project on wildlife species-at-risk,  goshawks were "present
throughout forested habitats in the Divide landscape," in numbers
"typical of natural populations in the Rocky Mtns" and
"[s]uitable habitat [was] widespread."  AR1 S17, at 7.  The
report further states that "[g]oshawks inhabit the project area
at population levels representative of the Divide landscape as a
whole."  AR1 S17, at 7.  The record contains years worth of data,
including habitat sampling by transects of goshawks through the

Northern Region Land Bird Monitoring Program, annual nest site
surveys for goshawks and monitoring of those sites since 1995,
and field surveys for goshawk.  AR 2, DD 382, at 2-3; AR2 DD 384-
395 (Land Bird Monitoring Data); AR2 DD214, 378, 381 (goshawk
nest site monitoring reports); DD 206 at 14-16; 214 at 29.  It is
clear from this and other evidence of record that the Forest
Service indeed obtained both habitat and species population data
for the goshawk.  Review of the record thus indicates that the
methodology used by the Forest Service to identify and monitor
goshawk habitat was sound, and the Forest Service used the data
sources identified in the Forest Plan in its monitoring efforts.

The Ninth Circuit approved the Forest Service's use of the
very same methodology in *Native Ecosystems.*  As in *Native
Ecosystems*, the Forest Service considered the habitat
recommendations in the Reynolds Report.  *See e.g.*, AR 1 W9, 159-
60, 178, 175-76, 194; AR1 S17, 33-34; AR 2, DD630, 220.  The
Plaintiffs have conceded that the Reynolds Report "is still the
best science available on goshawk habitat needs."  Pls.' Summary
Judgment Response/Reply Br., at 10.  Plaintiffs nevertheless
argue that the Forest Service did not adequately consider the
Project's potential impact on the available post-fledgling family
area [PFA] habitat of the goshawk.  Pls.' Supp. Br., 4.  But the
record establishes that the Forest Service specifically found the
Project would not render any goshawk home ranges unsuitable, and

-27-

would not displace any resident goshawk.  AR 1, W9, 178, 233.
The updated Biological Evaluation specifically discussed PFAs,
noting that "six goshawk activity centers have been identified
and monitored in the Clancy-Unionville project area since 1996,"
and some of those "represent ranges within which active nests or
post-fledgling family areas (PFAs) have been identified."  AR 1,
S17, 32.  The Biological Evaluation considered the effect of the
Project on these areas, noting that it would "open up mature
forest within three occupied goshawk home ranges," and "two
potential ranges," but modify only "an average of 4.2% of the
timber stands within each home range." AR 1, S17, 33.  This
modification "would not reduce the number of goshawks currently
occupying the project area or that would be able to occupy the
area in the future."  AR 1, S17, 34.  Finally, this Court notes
that the Ninth Circuit specifically recognized in *Native
Ecosystems* that "[n]othing in the law or the science mandates
wholesale adoption of the details of the Reynolds Report."
*Native Ecosystems*, 428 F.3d at 1242.

The record thus indicates that the Forest Service adequately
addressed the habitat recommendations of the Reynolds Report, and
applied the best available science in a manner consistent with
the Forest Plan with respect to the goshawk.

Plaintiffs also argue that the Forest Service acted
arbitrarily and capriciously because it ignored concerns

expressed in a six-year-old letter from the Montana Department of Fish, Wildlife and Parks (MDFWP) commenting on the Draft EIS. The MDFWP's comments on the Draft EIS are of no help to Plaintiffs, because they were subsequently addressed in the Final and Final Supplemental EISs.  AR1 W6; AR1 W9; AR1 R55 at 2, 10,21.

### ii.  Pileated Woodpecker

Plaintiffs contend that the Forest Service failed to consider the pileated woodpecker's preference for trees of rather large diameter.  Pls.' Br. in Support, 17.  As with the goshawk, the Forest Plan standard for the pileated woodpecker requires that the Forest Service monitor old growth habitat.[7]  AR1 W1 at IV/8.

The FSEIS specifically discusses the pileated woodpecker's use of large diameter trees and considers the effects the proposed timber harvest could have on the species.  AR1 W9, at 158, 164, 234.  The Forest Service considered both habitat and population data.  Based on that data, it determined that potential pileated woodpecker habitat was widely distributed throughout the Project area, and concluded there was enough suitable habitat to maintain the existing viable population of woodpeckers.  AR1 W9, at 158-59.  The Forest Service determined

---

[7] Again, the Forest Plan requires that the Forest Service monitor 20% of old growth habitat units annually.

that while the Project would modify a small amount of woodpecker habitat, those modifications would not be sufficient to influence population viability.

Although Plaintiffs do not discuss the best available science standard anywhere in their briefing, including their supplemental briefing, they do argue with respect to the pileated woodpecker that the Forest Service should have followed "*Warren*, 1990, a R1 guidance document," which sets forth standards for monitoring pileated woodpecker habitat.  Pls.' SJ Brief, at 17, n. 11.  Review of the record indicates that the Forest Service did in fact consider Warren when analyzing the Project's impact on the pileated woodpecker.  AR1, T53, at 54.  Plaintiffs have not presented any evidence suggesting that the Forest Service failed to apply the best available science in a manner consistent with the Forest Plan with respect to the pileated woodpecker.

### iii.  Hairy Woodpecker

With regard to the hairy woodpecker, Plaintiffs assert that the Forest Service has failed to produce any "hard data for local or forest-wide populations, trends, or snag habitat."  Pls.' Br. in Support, 17.  But the FSEIS specifically cites several "landbird monitoring surveys (1994, 1995, 1997, 2000, 2002) and general wildlife surveys (1995-2002)," which "indicate that the hairy woodpecker is the most common woodpecker in the project area.  AR1 W9, at 158.  The FSEIS also notes that "[a] map of

Potential Hairy Woodpecker Habitat in the Blackfoot and Divide Landscapes (project file) shows that such habitat is widely distributed and abundant in the Clancy-Unionville area." AR1 W9, at 158.  The Forest Service found that combination of habitat and population data was sufficient "to indicate that populations of hairy woodpeckers are viable and that local ecological conditions are capable of sustaining this viability over time.  AR1 W9, at 158.   The Forest Service legitimately relied on population and habitat data, and its methodology for assessing the Project's potential impact on the hairy woodpecker was sound.[8]

The FSEIS also indicates that the Forest Service relied on the 1995 Hutto study, when assessing the Project's expected impact on the hairy woodpecker. AR1, W9, 110.  Plaintiffs make no argument that Hutto is not the best available science.  They have pointed to no evidence that the Forest Service failed to follow the best available science in a manner consistent with the Forest Plan.

Plaintiffs argue that the Project would include harvest units with large snags and woody debris, and maintain that the Forest Service has not provided any hard data to establish that the Project complies with the Forest Plan's standard for snag habitat.  The Forest Plan standard for snag habitat provides

_____

[8] As with the goshawk and pileated woodpecker, the Forest Plan requires that the Forest Service monitor 20% of old growth habitat units annually.

that: "To keep an adequate snag resource (standing dead trees) through the planning horizon, snags should be managed at 70 percent of optimum (average of 2 snags/acre) within each third order drainage."   AR1 W1, at II/21.

According to the FSEIS, "[t]he Clancy-Unionville area currently meets Forest Plan drainage-wide standards for snags." AR1, W9, at 111.  The Forest Service concluded that Project would result in little change to that dead tree habitat.  Specifically, it found that while "some large snags would come down during logging, others would be created during prescribed burning.  The result would be little change in the availability of large diameter dead trees." AR1 W9, 234.  While the Forest Service does not point the Court to the data of record underlying its conclusions, neither does Plaintiff point the Court to any evidence that would undermine the Forest Service's conclusions. In the absence of any evidence suggesting that the project area was in fact out of compliance with Forest Plan standards, Plaintiffs' challenge fails.

### iv.  Fisher

Plaintiffs challenge the Forest Service's determination that the Project will have no impact on the fisher on the basis that the 2003 Biological Evaluation did not indicate whether fisher habitat had been surveyed and mapped.

The Forest Plan contains no specific monitoring requirements

for the fisher, which is a sensitive species rather than an MIS.
However, "[m]anagement guidance is to maintain sufficient habitat
to ensure viability of local populations." AR1 W9, at 147. The
FSEIS explains that "[f]ishers are rarely reported near the
Clancy-Unionville area but may be present in very low numbers."
AR1, W9, at 146.  While the 2003 Biological Evaluation may not
indicate whether fisher habitat had been surveyed and mapped, it
identifies a number of specific spots within the project area
that have characteristics consistent with core fisher habitat.
AR1 S17, at 24.  As the FSEIS similarly states, "[p]ockets of key
habitat (old-growth conifer stands) are dispersed through the
project area," and "[g]ood habitat patches for fisher occur
around the joint headwaters of lump gulch and the North Fork of
Quartz Creek, in South Fork of quarts Creek, in upper Kady Gulch,
in Little Corral Gulch, and around Frohner Basin." AR1 W9, at
147.  Because the forest stands to be harvested would "include
only minor areas of marginal fisher habitat," the Biological
Evaluation concludes that the Project would have no impact on the
fisher.  AR1 S17, at 24-25.  The Biological Evaluation concludes
that the Project's road closures would actually benefit the
fisher by reducing human access.  AR1 S17, at 25.  The record
thus indicates that the Forest Service considered the effect the
Project would have on the fisher, and complied with its
management directive to avoid or minimize any impact on the

species.

Moreover, it is clear from the Biological Evaluation that the Forest Service relied on Heinmeyer & Jones, which sets forth the various habitat needs for fisher, as well as several other studies when evaluating the Project's potential impact on the fisher.  AR1, S17, 23-25.  Again, Plaintiffs point to nothing to suggest that these studies were not the best science available with regard to the fisher.

### v.   Lynx

Plaintiffs allege the Forest Service failed to comply with conservation strategies for the Canadian Lynx.  Citing the 2000 Canada Lynx Conservation Assessment and Strategy (CLCAS) recommendations, they assert that "the current conservation strategy for the lynx is that 10% of forested habitat within lynx conservation areas be in an old growth condition."  Pls.' Br. in Support, at 18.

The Forest Plan does not identify any monitoring requirements for the lynx.  Rather, "the Forest Service is bound by a series of Conservation Measures (standards and guidelines) set forth in the...CLCAS."  AR1 S17, at 15.  The CLCAS "directs that management actions such as timber harvest should not change more than 15% of lynx habitat within a [lynx analysis unit] to an unsuitable condition in any 10-year period."  AR1 S17, at 15.  The 2003 Biological Evaluation considered the management

-34-

guidelines set forth in the CLCAS in detail, and discussed
whether each proposed alternative met those guidelines.  The
Forest Service chose Alternative F, which met all applicable
CLCAS guidelines because it would "keep the acreage of harvested
lynx habitat below 15%."  AR1 S17, at 17.  Plaintiffs' argument
that the Forest Service failed to consider the effects of
grazing, fuels reduction, timber harvest, and off-trail
snowmobile use on the lynx, is not supported by the record.  AR1
S17, at 16-18.

Furthermore, both parties agree that the CLCAS sets forth
the current and appropriate management guidelines for the Lynx.
As such, there is no dispute that it constitutes the best
available science with respect to Lynx.  It is thus evident that
the Forest Service followed the best available science in a
manner consistent with the Forest Plan, in its consideration of
the Project's impact on the Lynx.

### vi.  Pine Marten

Plaintiffs make some vague argument related to the pine
marten.  They appear to challenge the Forest Service's monitoring
efforts, claiming that "while the [NFMA] requires that population
trends b[e] monitored for MIS," the population density and
distribution of the pine marten is unknown.  Pls.' Br. in
Support., at 19.

As discussed above, however, the Ninth Circuit continues to

endorse the proxy on proxy approach, so long as the underlying methodology is sound and the Forest Plan does not impose population monitoring requirements.  The Forest Plan in this case does not require population monitoring of the pine marten. Rather, it identifies "mature conifer suitability" as the "resource to be monitored" for the pine marten.  AR1 W1, at IV/8. That monitoring is to occur by way of "pine marten track counts."  AR1 W1, at IV/8.  The Forest Service points to evidence that it did in fact perform track counts.  For example, in 2001 the Forest Service conducted forty-five miles of track surveys for the pine marten in conjunction with monitoring the lynx.  AR2 DD206, at 16.  In 2002, the Forest Service surveyed another forty-five miles of road and trails, and forty more in 2003.  AR2 DD214, at 30-31.  The FSEIS explains that "[s]ufficient habitat is present throughout the Divide landscape to support viable marten populations."  AR1 W9, at 158.  The Forest Service was not required to maintain quantitative population data, and the record indicates it satisfied its monitoring obligations under the Forest Plan.

In addition, the record also indicates that the Forest Service considered several studies when evaluating the Project's impact on the pine marten, including Fager, Kujula, Coffin, and Buskirk and Ruggiero.  AR 1, W9, 140.  Plaintiffs have not argued that these studies are not the best available science.  There is

nothing in the record now before the Court to indicate that the Forest Service somehow failed to use the best available science, in a manner consistent with its obligations under the Forest Plan.

## C.   National Environmental Protection Act

### 1.   Legal Standard

Unlike NFMA, which imposes both procedural and substantive requirements on government agencies, NEPA imposed only procedural requirements.  *Lands Council*, 395 F.3d at 1026.  NEPA is intended "to force agencies to publicly consider the environmental impacts of their actions before going forward."  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002).  To fulfill this goal, NEPA requires a federal agency to prepare an EIS detailing the environmental impacts of every "major federal action...significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  NEPA further requires that a federal agency "'inform the public that it has indeed considered environmental concerns in its decisionmaking process.'"  *Lands Council*, 395 F.3d at 1026 (*quoting Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003)).  To "accomplish this, NEPA imposes procedural requirements designed to force agencies to take 'a hard look' at environmental consequences."  *Lands Council*, 395 F.3d at 1027 (*quoting Earth Island*, 351 F.3d at 1300).  NEPA requires that the

Forest Service consider the Project's "cumulative impact", which is defined by  regulation as "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7 (2000).

Only if the agency's analysis of the environmental impact is "arbitrary and capricious" or "contrary to the procedures required by law" can the reviewing court conclude that the agency did not take the requisite "hard look".  *Kleppe*, 427 U.S. at 410 n. 21; *Inland Empire*, 88 F.3d at 763.

### 2.   Plaintiffs' NEPA Claims

#### a.   Cumulative effects

Plaintiffs allege that the Forest Service failed to take a "hard look" at the cumulative effects of the Project on affected species.  Specifically, they maintain that the Forest Service violated NEPA because it provided only a "vague catalogue of past projects," without any species-specific analysis or analysis of the impacts associated with harvest strategies.  Pls.' Response/Reply, 23.

For support, Plaintiffs cite to *Lands Council*, 395 F.3d at 1027, in which the Ninth Circuit concluded that the Forest Service had not taken the requisite "hard look" at the cumulative effects of a proposed project.   The Ninth Circuit faulted the EIS in that case because it did not catalog past projects, did not list individual past timber harvests, and did not discuss

"the connection between individual harvests and the prior environmental harms from those harvests that the Forest Service now acknowledges." *Lands Council*, 395 F.3d at 1027-28.  For an EIS to be adequate under the standard set forth in *Lands Council,* it "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment."  *Lands Council*, 395 F.3d at 1028.  In light of the environmental harm the Forest Service admitted prior timber harvests had caused in that case, the *Lands Council* court explained that the EIS at issue there should have provided "adequate data of the time, type, place, and scale of past timber harvests and should have explained in sufficient detail how different project plans and harvest methods affected the environment."  *Lands Council*, 395 F.3d at 1028.

Here, the FSEIS contains a lengthy, thirty page cumulative effects analysis.  AR1 W9, 235-265.  Unlike *Lands Council*, the FSEIS does contain a catalog of historic, recent, and ongoing activities.  AR1 W9 at 241-247.  The catalog identifies the three recent timber sales in the area by name, states when and where they occurred, and describes the scale of the prior sales.  AR1 W9, at 243-44.  The FSEIS also describes, though admittedly not in great detail, the "general effects" those prior timber sales had on the environment.  AR W9, at 243-44.  Citing *Lands*

*Council,* Plaintiffs argue the FSEIS should have contained more detail as to how the different harvest methods involved in those sales affected the environment.   While the *Lands Council* court faulted the EIS in that case for not including those details, it did so under very different circumstances.   In that case more than 40,000 acres in the project area had been logged.   *Lands Council*, 395 F.3d at 1025.   As a result of that "intense logging, all but two of the fourteen watersheds within the Project area either [were] not functioning or [were] functioning at risk." *Lands Council*, 395 F.3d at 1025.

Here, in contrast, only 1,400 acres in the nearly 40,000 acre project area have been logged since the early 1970s, and there is no evidence of the serious "environmental degradation" that the Forest Service agreed was present in *Lands Council*. AR1 W9, at 243.   Although the FSEIS at issue here discusses the effects of prior timber sales in general terms, that is probably adequate under NEPA's deferential standard, given the different circumstances present in *Lands Council*.

Plaintiffs also maintain that the Forest Service failed to adequately consider the cumulative effects of the project on various old-growth species.   As discussed above, however, the Forest Service adequately analyzed the Project's potential effect on old growth associated species. The 570-page FSEIS contains a lengthy discussion of the effects of the Project on old growth

and other species.  AR1 W9, 103-234.  That analysis meets the
Forest Service's procedural obligations under NEPA.

> **b.  Alleged improper tiering of project to decisions in a non-NEPA document**

Plaintiffs allege that the Forest Service improperly
"tiered" the Project's FSEIS to a non-NEPA document, the Divide
Landscape Analysis ("DLA").  Complaint, ¶ 198.  The DLA was
performed after the Forest Service adopted Ecosystem Management.
According to Plaintiffs, a new NEPA analysis needs to be
performed, and the HNF Plan must be amended, detailing the
effects of Ecosystem Management on the HNF.  In opposition to
that argument, Defendants contend that "the Clancy SEIS does *not*
tier to the [DLA]; it incorporates it by reference." Def.'s
Brief, pg. 22.  Therefore, Defendants claim the FSEIS was not
improperly tiered to a non-NEPA document.

Plaintiffs provide no clear explanation of how Defendants
"unlawfully tiered."  Similarly, Defendants fail to explain the
distinction between "tiering" and "incorporating by reference,"
and provide no support for the assertion that they have
permissibly done the latter.  Fortunately, *Kern v. BLM*, 284 F.3d
1062, 1073 (9th Cir. 2002), is instructive.  According to the
court in *Kern*, "[t]iering, or avoiding detailed discussion by
referring to another document containing the required discussion,
is expressly permitted by federal regulation" unless the document
being tiered to "has not itself been subject to NEPA review."

*Kern*, 284 F.3d at 1073.  However, Council for Environmental Quality "procedures allow agencies to incorporate by reference certain materials to cut down on the bulk of an EIS," notwithstanding the fact that the documents incorporated by reference (but not tiered) are non-NEPA documents. *Kern*, 284 F.3d at 1073.

By its terms, the FSEIS does not tier to the DLA, but instead incorporates the DLA by reference. AR 1, W9 at Summary, 7.  The FSEIS states that it "is tiered to the Helena Forest Plan and relies on direction provided by [that] document. . .  The [DLA] provided the supporting rationale for developing the purpose and need and design of [the Project], and is incorporated by reference."  AR1, W9 at Summary, 7.  The HNF Plan to which the FSEIS tiers to is a NEPA document.  Tiering to a NEPA document "is expressly permitted by federal regulation," *Kern*, 284 F.3d at 1073, so tiering to the HNF Plan is expressly permitted.

The substance of Plaintiffs' argument evades this court. Plaintiffs seem to argue that the HNF Plan was not properly amended after the Forest Service adopted Ecosystem Management and created the DLA. *See* Pl.'s Compl., ¶ 199; Pl.'s Resp. and Reply, pg. 19.  However, this fails to explain why tiering the FSEIS to the HNF Plan, which was subject to NEPA review,  and incorporating the Divide Landscape Analysis into the FSEIS by reference, was at all improper.  The language of the FSEIS is

clear: it is tiered to the HFS Plan, but not to the Divide Landscape Analysis.   Therefore, Plaintiffs' arguments to the contrary are without merit.

## V.  Conclusion

Based on the foregoing, the Court recommends that Plaintiffs' motion for summary judgment be denied in all respects, and Defendants' motion be granted.